PAUL KOEHLER et al. v. JAMES A. HUGHES, et al.

Western Section.   November 13, 1931.

Petition for Certiorari denied by Supreme Court, April 30, 1932.

Crabtree & Crabtree, of Memphis, and James Stone & Sons, of Oxford, Miss., for appellant.

Church & Gannaway, C. N. Fox, John H. Poston and Metcalf, Metcalf & Apperson, of Memphis, for appellee.

SENTER, J. The original bill in this cause seeks the rescission of a deed executed by Henry H. Beall, to complainant Paul Koehler, conveying a tract of about 3300 acres of land in Mississippi, referred to in the record as the Coffee plantation; and also seeks to recover judgment against defendants, James A. Hughes, Turley-Bullington Mortgage Company, and Fidelity Mutual Life Insurance Company of Philadelphia, for the value of certain property located in Memphis, which was conveyed by complainants to defendant Hughes, Trustee, as a part of the consideration for the deed of conveyance to the Coffee plantation. Henry H. Beall died before the suit was filed, and his heirs were named as defendants. It being admitted that he held the title to the Coffee plantation as trustee of and conveyed for the Turley-Bullington Mortgage Company, and that his heirs were therefore eliminated. Frank S. Hill and J. C. Pippin, who purchased the Memphis property conveyed by Koehler to Hughes, were made defendants, but it is admitted that the court correctly held that they were innocent purchasers, and are also eliminated.

The bill as amended bases complainant's right to a rescission and a recovery upon three grounds; (1) Fraud, (2) Mistake, (3) Failure of Title.

The original bill alleges that complainants were the owners of certain real estate in Memphis, and that Paul Koehler owned a business house and lot on Main Street at Talbot, and that Frank Koehler owned a residence on College Street. It alleges that about February, 1927, pretending to represent and act for the defendants Mortgage Company and Insurance Company, whom he claimed were the owners of the Mississippi plantation, and Hughes, who was a real estate man engaged in the real estate business in Memphis, suggested and negotiated the exchange, whereby Koehler would exchange the Memphis property, consisting of a business house and residence, with certain encumbrances thereon, with the owners of the Mississippi plantation, with certain encumbrances thereon. The encumbrances on the respective properties to be assumed by the respective parties to the exchange or trade. It is alleged that Hughes was a man of long experience in the real estate business and had a broad knowledge of farm values, and that he carried the Koehlers to see the plantation, and represented to them that the plantation was worth $75-000 or more, and made other representations which induced the Koehlers to become interested in acquiring the plantation, on condition that Hughes would assist them in looking after and managing the plantation property, taking an interest in the plantation for his compensation, and that Hughes agreed to this condition, and that the

14

relation of trust and confidence induced Koehler to rely upon the judgment of Hughes as to the values, and also the details of closing the trade. The bill alleged that the defendant Insurance Company, through its agents, defendant mortgage company, in March, 1922, made a loan of $12,000 on the plantation, to secure which Coffee, the then owner, conveyed it to defendant T. J. Turley, Trustee; that the interest on the loan and the taxes on the plantation were delinquent and unpaid in February and March, 1927, for a considerable sum, and that both the insurance company and mortgage company were anxious to sell the plantation to a responsible party, and thereby collect the loan or to get it in better condition; that in furtherance of this purpose and desire the sale of the plantation by said companies was placed in the hands of defendant Hughes; and that these companies shared with Hughes the fruits and benefits derived from Hughes' frauds. It is alleged that on March 23, 1927, Hughes wrote the contract between himself as "trustee," and Paul Koehler, for the exchange of both properties of the Koehlers for the plantation. The contract was signed, the bill alleges, by Hughes still representing that he was acting as the trustee for the defendants Mortgage and Insurance Companies. It is alleged that Hughes represented to Koehler that there was sufficient timber on the land to pay the encumbrance thereon amounting to $15,500, which was to be assumed by Koehler, and that the representation with reference to the timber was a material inducement to the trade. The bill alleges that when the abstract of title to the plantation was furnished to complainant it was found that the title in Henry H. Beall, who was an officer and holding for the mortgage company, was good, except that the abstract showed that on January 24, 1923, that the then owners of the plantation had conveyed the timber to Maxey and Rhea, with five years time to cut and remove the timber. The bill further alleges that it was represented to complainant through the attorney for the defendant Mortgage and Insurance Companies, Mr. Gannaway, that the trust deed to T. J. Turley, trustee, dated March 22, 1922, to secure defendant insurance company's loan antedated the timber deed, and that foreclosure would eliminate the timber claimants, and that the deeds were executed and passed with the understanding that the trust deed would be foreclosed; that Koehler would buy the plantation at the trustee's sale, and that the loan of the Insurance Company would then be adjusted to conform to the amount and maturities provided in the contract between Hughes, trustee, and Koehler, and secured by a new deed of trust to be executed by Koehler; that thus believing that the legal title of the insurance company in T. J. Turley, as trustee, was superior to the timber title in Maxey and Rhea, and that the suggested foreclosure would eliminate the timber claimants

and rid the plantation of the timber cutters who were then in possession cutting timber, complainants agreed to defendants' suggested method of closing. The bill alleges that defendants then prepared, executed and delivered the deed from Henry H. Beall (holding and conveying for his principals, the Mortgage Company and the Insurance Company, not disclosed therein) to Koehler; that the receipt of Koehler's Memphis properties is acknowledged in the deed, and recites the assumption by Koehler of the $12,000 Coffee loan, and the execution of the demand note payable to Henry H. Beall in the sum of $3500; and at the same time the bill alleges that the defendants had their attorney, Mr. Gannaway, to prepare the deed and had complainants, Koehler, execute and deliver the deed conveying their Memphis properties to defendant, James A. Hughes, as trustee. The bill alleges that the foreclosure was had on June 4, 1927, and that the plantation was bid in by complainant Koehler, but that he refused to go forward with the deal because the timber claimants and cutters refused to vacate, notwithstanding foreclosure. The bill then alleges that it was agreed by complainants and defendant Companies that the completion of the deal would await and hinge upon the result of an injunction suit to be filed by Koehler against the timber cutters, to determine whether the foreclosure was effective as against them; that the suit was filed, and the timber claimants, Maxey and Rhea, relied upon their timber deed, and a written, but unrecorded consent for a recited consideration of defendant Insurance Company and T. J. Turley, Trustee, to the cutting and removal of the timber; that defendants were given notice of the contention and requested to come in and defend against it; that they ignored the notice; that the injunction suit resulted in favor of the timber claimants, Maxey and Rhea, who continued in possession until the expiration of their time limit, January 24, 1928, removing substantially all the timber. It is alleged that after the injunction suit had been dismissed that complainant Koehler was willing to carry out the deal and adjust the timber; that negotiations to that end in view were had. It is alleged that these negotiations were terminated by the Insurance Company and T. J. Turley, trustee, filing suit against the Koehlers in the Chancery Court of Marshall County, Mississippi, in October, 1929, to foreclose the Coffee deed of trust and recover from Koehler a deficiency judgment; that complainants had filed a cross-bill seeking rescission because of the frauds and mistakes, making Hughes and the Mortgage Company parties defendant, which cross-bill was dismissed as to Hughes and the Mortgage Company, on the demurrer of the Insurance Company. The original bill is elaborate and contains other allegations and details of the transactions between the parties, not necessary to now refer to.

By their answers the defendants Mortgage Company and Insurance Company, deny that Hughes was their agent, acting for them in the transaction, and deny that any fraud was practiced. By their answers they allege that on March 24, 1927, T. J. Turley, agent, entered into a contract with James A. Hughes, by which they agreed to convey the plantation to Hughes, or his designee, for $18,000, which amount was intended to represent the amount of the insurance company's loan and accumulated interest and taxes, on terms set out in the contract; that they had no knowledge of the contract between Hughes and Koehler, and that their conveyance to Koehler through the deed executed by Beall was carrying out the contract between Turley, agent, and Hughes, upon Hughes' order and direction. The answers of these two defendants are filed as cross-bills, and judgment against Koehler are prayed by the Insurance Company for deficiency upon the foreclosure of its Coffey mortgage and by the mortgage company for the $3,500 demand note to Henry H. Beall. After these answers were filed the bill was amended so as to allege that Hughes representation that he was acting as trustee for defendants Insurance and Mortgage Companies was false; that he concealed from the complainants the fact that he was acting for himself and that he had the contract for himself for the purchase of the plantation for $18,000. Hughes also answered and denied the material allegations. A large volume of proof was taken by the respective parties, and at the hearing of the cause the Chancellor denied the relief sought by complainants, and dismissed the original bill and rendered judgments in favor of the defendants Mortgage and Insurance Companies on their cross-bill. From this decree complainants prayed an appeal to this court, which appeal was granted and has been perfected and numerous errors assigned. We deem it unnecessary to take up and consider each of the several assignments of error.

These assignments are all directed to the findings of fact and the conclusions of law reached by the Chancellor. The first six assignments of error refer in different forms to the materiality of the timber deed or contract held by Maxey and Rhea, and the unrecorded written consent of J. T. Turley, as agent, and the alleged concealment of the timber deed and the unrecorded release signed by Turley, agent, and the alleged loss resulting to complainants by reason of the timber deed and the removal of the timber by the timber claimants.

The seventh and eighth assignments complain at the action of the Chancellor in not finding and holding and decreeing that a relation of trust and confidence arose at the beginning of the transactions between Koehler and Hughes; that in that relation Hughes intentionally represented to Koehler that he was acting for the Mortgage

Company and the Insurance Company, and concealed the fact that he was acting for himself, and the fact that he had the agreement with the mortgage company to himself to purchase the plantation for $18,000, and represented to Koehler that the plantation was worth $75,000, knowing that the representation was false; that said misrepresentations and concealments were of and concerning material facts, and constituted positive fraud, entitling complainant to a rescission of the deed, and that the Mortgage Company and the Insurance Company received benefits from the transaction by receiving the $3500 note and Koehler's assumption of the Coffey mortgage, and that by the filing of the cross-bills on these demands it was a ratification of the fraudulent acts of Hughes.

There is contained in the record a full and complete finding of the facts and conclusions of the Chancellor.

We have examined the record with care, and after full consideration, we fully concur in the finding of the facts as found by the Chancellor, and in his conclusions, and here adopt the same as expressed in his language, which is as follows:

"On March 23, 1927, complainant, Paul Koehler, and defendant, James A. Hughes, as Trustee, entered into a written contract for the exchange of certain properties therein described. Paul Koehler agreed to convey to James A. Hughes, Trustee, a lot located at Main and Talbot Streets, Memphis, subject to a mortgage indebtedness of $3,500, on which there was an old building, and a lot on College Street, Memphis, on which there was a dwelling house, for the "Coffee Plantation," consisting of some 3326 acres, subject to a mortgage indebtedness of $15,500. Paul Koehler, it appears, did not own the College Street lot, but the same belonged to his brother, Frank Koehler, who agreed that it should be embraced in the trade.

This property was subject to a mortgage indebtedness of $2,640, but was to be conveyed to Hughes free of incumbrance. Hughes, it appears, did not have title to the Coffee Plantation when said contract for exchange of properties was made, but did have a verbal agreement with T. J. Turley, President of Turley-Bullington Company, for its purchase by him, and on March 24, 1927, the day subsequent to the making of said contract for exchange, obtained a written contract, executed by T. J. Turley, by the terms of which he, James A. Hughes, was to purchase said plantation at and for the price of $18,000, on terms of $2500 cash, the assumption of a first mortgage indebtedness of $12,000, and a note for $3500, due in five years, with interest at six per cent, secured by a second mortgage on said land. Hughes agreed to pay taxes for 1926 and 1927. The $3500 note represented interest on the $12,000 mortgage debt and taxes advanced and paid by the Turley-Bullington Company, which

Company made the loan for defendant Fidelity Mutual Life Insurance Company, to A. H. Coffee, the owner of said plantation, on March 18, 1922, secured by first mortgage on said place. This loan of $12,000 matured $500 a year, beginning April 1, 1927, and the balance of $9,500 matured April 1, 1932. It appears that A. H. Coffee had conveyed the plantation to one Russel Polk, who had become insolvent and had conveyed the place to Percy Biggs, Trustee, for the Union & Planters Bank & Trust Company, the holder of an indebtedness secured by second mortgage thereon and on certain land in Arkansas. It appears that in the early part of the year 1927, James A. Hughes, with whom the Turley-Bullington Company, or T. J. Turley, or the Fidelity Mutual Life Insurance Company had had no real estate transaction that Mr. Turley can recall, approached Henry Beall, Secretary and bookkeeper of the Turley-Bullington Company, and T. J. Turley, President of said Company, and sought to interest them in a trade of the Coffee Plantation for the Main Street property of Paul Koehler. Taxes and interest on the mortgage debt on the plantation were accruing, the plantation was lying uncultivated, and, in this situation, the Turley-Bullington Company was willing to dispose of the place for the total of the indebtedness thereon, as was their policy generally with regard to places on which they controlled mortgage indebtedness, in default. On the possibility of a trade, as suggested by Hughes, Mr. Turley went with Hughes and inspected the Koehler property. The result of this inspection, as stated by Mr. Turley, was, "that I would not be interested in the matter, for the reason that I did not think the property was worth but little more than the mortgage debt on it ($35,000) and particularly because of the very old and dilapidated condition of the building. I knew in a general way about this property and its age and all of that, and I knew this building was a very old building." Mr. Turley further states that the real estate values on Main Street, near Talbot, had been receding since 1922. The conclusions reached by Mr. Turley resulted in the abandonment by Hughes of a trade between Turley and Koehler. Some weeks later, Mr. Hughes again saw Mr. Turley and asked if he might purchase the Coffee plantation. Turley stated to Hughes that he would sell him the place for the total that Turley-Bullington Company and the Fidelity Mutual Life Insurance Company had invested therein. Turley said "We do not want to make five cents on it, we want to get our money out of it," and referred Hughes to Henry Beall to ascertain the amount of money they had in it. Beall reported to Turley that the plantation stood them about $18,000. Thereupon Mr. Turley agreed to sell the place to Hughes for that sum. Through some oversight, Beall failed to include $3,222 additional taxes on the place paid by the Turley-Bullington Com-

pany, and as a result, the price given Hughes showed an actual loss to them of $3,200. Hughes requested that Turley would wait on him a reasonable time to enable him to see a party at Paducah, Kentucky, and secure from him financial assistance in making the purchase. Mr. Turley agreed to this delay and on March 24, 1927, Hughes reappeared and stated that he would buy the plantation. Thereupon, a written contract of sale was drawn up and executed by Turley and Hughes. Up to this time Mr. Turley was uninformed as to what disposition Hughes would make of the plantation, or with whom he was negotiating for its purchase. In no way was T. J. Turley, the Turley-Bullington Company, or the Fidelity Mutual Life Insurance Company, connected with the trade gotten up between Hughes and Koehler. Hughes, in negotiating with Koehler for the trade, and in contracting with Koehler for the exchange of his property for the Coffee plantation was not acting as agent for T. J. Turley, the Turley-Bullington Co., or the Fidelity Mutual Life Insurance Co.; nor, had said parties held out to Koehler, or anyone else, that Hughes was their agent to sell or trade the Coffee plantation. When Hughes, on March 24, secured the written contract for the purchase by him of said plantation, it was the first time Mr. Turley heard the name Koehler mentioned as the person with whom Hughes was dealing for the disposition of the plantation. These parties, above named, had no knowledge or notice of the representations made by either Hughes or Koehler with reference to the properties embraced in the trade, nor were they acquainted with the terms of the trade. Hughes' contract for the purchase of the plantation contained the provision that said lands would be conveyed to him "or any person he may name." Koehler's attorney elected to take a deed from Henry H. Beall, holding title for the Turley-Bullington Company and the Fidelity Mutual Life Insurance Company. The contention made on behalf of the complainants that this conveyance amounted to a ratification of Hughes' statement and acts in negotiating the trade is without merit.

The bill charges that defendant Fidelity Mutual Life Insurance Co., through its agents, Turley-Bullington Co. and T. J. Turley, participated with James A. Hughes in defrauding complainants of this property; and shared with Hughes in the fruits thereon. The proof utterly fails to sustain this allegation of the bill. The charge of fraud against Turley-Bullington Co., T. J. Turley and the Fidelity Mutual Life Insurance Co. finds no justification in the record. They did not share in the profit made by Hughes. Beyond making a contract to sell the plantation to Hughes, as they had a right to do, and executing a deed direct to Paul Koehler, as they were requested, they had absolutely nothing to do with the transaction whereby Paul Koehler acquired the property.

2. Complainants' case against Hughes may be said to consist of the contention that Hughes exaggerated the value of the Coffee plantation; that they believed Hughes to be the agent in the transaction for the Turley-Bullington Co., and did not know he was acting for himself; that Hughes was a joint venturer with them in acquiring the Coffee plantation, and due to their ignorance of his ownership, under contract, they are entitled to rescission. The contention is made that complainants were wholly inexperienced in farm land values and depended on Hughes' judgment as to the value of the Coffee plantation. The record discloses that complainants for many years have conducted in Memphis a business of paving and construction contractors and have handled large contracts. It appears that complainants had purchased several pieces of Memphis real estate, and that Paul Koehler had acquired the Main and Talbot Street property in a trade with the sister of Captain Robert Lee and Reese Lee, some fifteen years ago. It appears that before making the trade with Hughes, complainants went to Mississippi, and inspected the Coffee plantation. It is not insisted that Hughes said or did anything to restrain or discourage complainants from seeking independent advice as to the value of the property. Frank Koehler testified that Hughes made no effort to keep him and his brother from ascertaining the real value of the plantation. Frank Koehler is fifty-two years old and Paul Koehler is sixty-three years old. Both are experienced business men, and in so important a transaction as the trade for 3325 acres of land and their own confessed ignorance as to the value of farm lands, it is difficult to believe that they made no inquiry as to its value, but relied instead on the estimate of value made by total strangers, whom they believed represented the seller of the property. It is admitted that neither of the complainants had ever met Hughes prior to his suggesting the trade to them; yet, according to their testimony, they accepted unchecked his statements with reference to the value of this large body of farm land. It must be noted that in the contract for exchange no valuation is placed on the property involved. The transaction was a trade. In the negotiations for the trade, Hughes put a valuation of $65,000 on the plantation for trade purposes, but expressed his opinion it was worth $75,000. On the other hand, Paul Koehler was not over-modest and placed a valuation of $75,000 on the Main Street property. The record shows that Hughes makes no claim to a knowledge of Mississippi farm values. His estimate of the value of the plantation was based on a report of two expert appraisers, made to Turley-Bullington Co. for loan purposes, in 1922, and exhibited to him. The record shows that the plantation was conveyed to Polk, in July, 1923, for a consideration of $52,000. Because a valuation of $65,000 was placed on the plantation by

Hughes for trade purposes, it would be far from the truth to believe that complainants paid that sum for the property. Equities only really counted in the trade, Paul Koehler's valuation of $75,-000 is far from being supported by a preponderance of the evidence. Such experts as E. B. Lemaster, Millard Naill, Percy Galbreath, and others, place a valuation of from $37,000 to $45,000 on said property. According to these experts Koehler's equity was worth from $2,600 to $10,000, taking the lowest and highest estimate. On the other hand, according to the testimony of five qualified witnesses, the value of the Coffee plantation was placed at from $36,000 to $43,000. According to this testimony the equity in the place had a value of from $20,500 to $27,800. Complainants acquired this equity for the equity in the Main Street property, worth, taking the highest figure above mentioned, $10,000, and the College Street property value for trade purposes at $6,000, or a total of $16,000. I cannot agree that complainants got the worst of the trade so far as values are concerned.

Unquestionably, complainants had ample time within which to ascertain the value of the plantation. They took possession of the place very soon after making the contract for exchange and kept possession until the appointment of receiver in the foreclosure suit at Holly Springs, instituted in October, 1929. In other words, they farmed this plantation during the years 1927, 1928 and 1929. During the whole of this long period of time it does not appear that complainants made any complaint whatever about the estimate or value placed on the plantation by Hughes. Complainants could have made this inquiry as to values just as well in February or March, 1927, as in the fall of 1929, or any other time. Mr. Crabtree testifies that after the bringing of the foreclosure suit in October, 1929, he went to the Union & Planters Bank and learned that W. P. Biggs, trustee for the bank, had conveyed its interest in the plantation to Henry H. Beall without consideration. It appears that the U. & P. Bank held a second mortgage on this land, executed by Russell Polk, along with other collateral, to secure a certain indebtedness. The bank was unwilling to put out additional money to pay taxes on the plantation and interest on the first mortgage, and having other security, agreed to convey to Beall, for the Turley-Bullington Co. The policy of the bank is opposed to putting out money to protect a second mortgage, save in certain cases. Out of the additional collateral it held, it seems that the bank was finally paid the whole of this claim. The fact that the bank was willing to quit-claim to Beall, and thereby save Turley-Bullington from the necessity of foreclosing on the first mortgage, does not tend to show under the circumstances, that the place had no value over the first mortgage lien of $15,500. Mr. Armistead, bank official, though he ad-

mits his disqualification to pass on farm values in Mississippi, placed a low value of $10 per acre on the place. This valuation as low as it is, shows a value in excess of the first mortgage indebtedness and the $5,000 secured to the bank by second mortgage.

Complainants insist that had they known that Hughes was ·purchasing the plantation for $18,000 they would not have traded with him. I have already shown herein that the price made Hughes by Turley was based specifically on the amount the insurance company and Turley-Bullington had invested therein, and was not based on the valuation of the plantation. The price fixed was not indicative of the value of the place. What controlled Koehler in the trade was the value of the thing he was to receive. Here let me advert to the situation confronting Koehler with respect to his Main Street property at the time he agreed to the trade. He owed a mortgage indebtedness thereon of $35,000, payable $7,000 a year and interest. The 1927 installment was about to fall due. Koehler was negotiating with Captain Bob Lee for an extension of this payment for one year, at which time if the extension was granted, he would be due to pay $14,000 and interest. Captain Lee's position was that he could not extend this payment without authority from his sister, in New York, who owned the mortgage. Mr. Koehler was anxious about this extension and expressed to Hughes the fear that he might lose the property. He said, ''These Lees are the hardest boiled people I ever dealt with.'' Koehler in his contract with Hughes agreed to get this extension. Hughes, accompanied by Mr. John Poston, his attorney, went to see Lee to get the extension. Fnally the extension was granted. Thus it appears that Koehler was in a tight place as to the main street property. Frank Koehler testified that this property was a big loan to carry; that little was being gotten out of it; that the property was rented for $200 per month. Interest on the $35,000 mortgage debt, amounted to $2100 for the year March 8, 1926, to March 8, 1927, while the rents would only total $2400. Then of course there were the taxes, insurance, repairs, etc. The building was very old. On February 17, 1927, when Koehler went with Hughes to inspect the plantation, he saw approaching March 8, when he would be due to pay Lee $7,-000. That he was unable to pay the sum and interest is fairly indicated by his anxiety for an extension of one year. In this situation, in my opinion, Koehler welcomed an opportunity to trade his equity in the place. According to such authority as E. B. Lemaster, Koehler's equity was worth only $5,000. Mr. Turley did not consider the property worth more than the mortgage. To succeed in getting anything for the equity was good business in my opinion. The record in this case does not at all make out a situation where a shrewd real estate man despoiled an incapable owner

of valuable property. That Koehler thereafter did not make a profit out of the plantation does not indicate that he was overreached in the trade. Mr. Crabtree confessed that he purchased a farm and lost several thousand dollars trying to operate it, and he mentioned this fact to Koehler before the trade was consummated.

Complainants insist that Hughes was guilty of fraud in failing to disclose that he was acting for himself in the trade. Hughes admits that he did not inform complainants that he was trading on his own behalf. His position is that it was immaterial to complainants who the owner was so long as they received all that they contracted for. I do not believe that Hughes told complainants that he was acting on behalf of the Turley-Bullington Co. or the Fidelity Mutual Life Insurance Co. He was not such agent, and the fact that he was not would inevitably disclose itself, as it did. Paul Koehler's position is that had he known that Hughes was acting for himself, he would have sought outside advice as to the value of the plantation. After twice answering that he would have relied on Hughes' estimate of value even though he had known he was owner, finally, under adroit questioning by his able counsel, stated that knowledge of such fact would have caused him to inquire as to value. It is difficult to understand why the value placed on the plantation by Hughes as owner would have less weight than the value placed by Hughes as agent for the owner. It would be pure folly to say that Koehler would not have made the trade had he known Hughes was the owner. The value of the plantation was the same regardless of who owned it. The only point made by Koehler is that he would have checked Hughes' statement of value had he known he was trading for himself. The question, then, is whether or not the failure to make outside inquiry was to his prejudice. The record shows that in the judgment of many experienced men the equity in the plantation was in an amount considered in excess of the equity in the Main Street property and the College Street house. The record shows that complainants paid less for the equity in the plantation than the equity was worth, or, to express it in another way, they received more value for their property than it was worth. However, as a matter of fact, complainants' attorney, for the examination of the title to the plantation, was fully informed that Turley had contracted to sell to Hughes for $18,000. A copy of this contract was furnished to Mr. Gannaway by Henry Beall. This was prior to the exchange of deeds. (It appears that Mr. Gannaway first drafted a deed from Beall to Hughes and ———— Perry, Hughes' partner in the transaction), and then drafted the deed from Beall to Koehler. Thus complainants secured the same advantage of a warranty from Beall as if Hughes had been his agent in making the trade. . . . Information furnished an

24

attorney employed to examine the title certainly must be considered as if furnished attorney's principals.

The contract for exchange shows Hughes as "Trustee." It is not stated who he was trustee for, and complainants say they did not inquire. It appears that one Perry, of Paducah, Kentucky, assisted Hughes in financing the deal. Hughes says: "The man who was putting up the money made me sign it that way. That was the only way I could handle it." It was necessary for Hughes to have some $1500 to pay off state and county taxes. Mr. Turley was informed when he agreed to sell Hughes that Hughes was getting outside financial help. Beall afterwards wrote Gannaway to make the deed to Hughes and leave a blank for the insertion of the name of his partner; later Gannaway learned this name was "Perry." It is my belief that Hughes had himself described in the contract as trustee in good faith, and for the protection of Perry as he believed.

Complainants next insist that Hughes was a co-purchaser with them of the Coffee plantation, a co-adventurer, and that because it was not disclosed by him that he was the contract owner of the property and was trading in his own behalf, a fraud has been committed upon them. I cannot agree that Hughes was a co-purchaser of the plantation with complainants. This co-adventurer theory is predicated upon the circumstances that complainants desired to operate the plantation and desired the assistance and advice of Hughes. For this service complainants voluntarily offered to give and did give Hughes a $2,000 interest in the place—not by any conveyance, but recited in a partnership contract between the two Koehlers and Hughes of date May 16, 1927. This contract provided in substance that none of the partners would receive any compensation for their services. Hughes, however, had acquired a small interest in consideration for his services, but could not thereafter claim compensation under the terms of the agreement. It is not shown that Hughes paid any money for this interest.

Complainants in their testimony attempt to make it appear that the $2,000 interest was given in payment of real estate commission owing Hughes. The fact is, however, that no commission was owing Hughes by complainants. No commission is provided for in the contract for exchange and none was charged, by Hughes. He was not in a position where he could make a charge for commission. The trade was between Hughes, trustee, and the Koehlers. An owner trading his property to another is not entitled to charge a commission. This adroit attempt on the part of complainants to make it appear that Hughes put in $2,000 in the purchase of the plantation must fail. As a matter of fact, according to Hughes, it was about the latter part of April, 1927, that Paul Koehler offered to give him the interest in the place, said he did not want to take Hughes' serv-

ices for nothing. When the Koehlers went down with Hughes to inspect the place, in February, 1927, Paul Koehler said to Hughes that if he purchased the place he would want his aid and assistance. The record shows that Hughes rendered all the services required of him by complainants. He became active in the management of the plantation and received no compensation save the original gift of $2,000 interest in the property.

My conclusion is that in no respect did James Hughes defraud complainants in the exchange of properties under the contract of March 23, 1927.

3. It appears that on January 1, 1923, Joe and W. R. Robbins, the then owners of the Coffee plantation, executed a timber contract to Maxey and Rhea, the consideration being $300, and 20,000 feet of timber to be selected. Three years was given to remove the timber north of the Abbyville Road, and five years to remove the remainder. Seventy acres in Marshall County was reserved, as also was the timber lying west of Wolf Creek. This contract was subsequent to the mortgage held by the Fidelity Mutual Life Insurance Company and it was provided that a release from the mortgage should be obtained. No release was obtained. On March 29, 1923, Turley-Bullington wrote Maxey and Rhea that they would consent to the sale and removal of timber bought by them from six inches up, "with the understanding that you are to build two bridges on said land as set out in your affidavit of date February 23, 1923." According to this affidavit of Maxey and Rhea, a part of the consideration for the release was that they "do hereby agree and bind ourselves to build two bridges on said land, one of same being across Tallahatchie Canal and one across Old River Run of Tallahatchie River, thereby greatly enhancing the value of said property . . . we anticipate these bridges costing us between $1500 and $2000, etc." The bridges were not built. Thus, the condition of the release was not fulfilled. When Mr. Gannaway examined the abstract of title to the plantation he found no waiver or release of record in favor of Maxey & Rhea, and, so, concluded the mortgage had priority over the timber contract. After consultation with Mr. Ike Crabtree, Mr. Gannaway drafted a deed from Beall to Koehler containing no exceptions in its warranties of the recorded timber contract. Complainants were anxious to get the timber cutters off of the place, and the plan was adopted whereby the mortgage of the Fidelity Mutual Life Insurance Co. should be foreclosed and bought in at the sale by Paul Koehler at $15,500. In this way it was believed by these attorneys that priority of title would be in Koehler over the timber contract. The plan was carried out and Paul Koehler became the purchaser at the agreed price. It was agreed that Koehler after purchasing at the foreclosure sale should execute a

new trust deed securing the Fidelity Mutual Life Insurance Co., in the sum of $15,500. The trustee's deed to Koehler was prepared but not delivered because Koehler refused to execute the new trust deed agreed on. His reason for refusing was that he would not go ahead and consummate the transaction until the timber cutters were off the land. It was finally agreed between Mr. Gannaway and Mr. Crabtree that the matter of closing of this matter would be deferred until Koehler could get a decision in a suit to be brought in the Chancery Court at Oxford, Mississippi, seeking to enjoin the further cutting of timber. Mr. Crabtree retained Stone & Stone, attorneys of Oxford, to prosecute this suit for Koehler. The defendant, Goodman, in defense to the action set up that the Fidelity Mutual Life Insurance Co. had waived priority over the timber contract. Mr. Crabtree notified Turley and Beall, the Turley-Bullington and the Fidelity Mutual Life Insurance Co., "of the fact that he (Koehler) held under the warranty of all of said defendants and calling upon them to come forward and defend against the timber claimants." The case was tried during the last week in November, 1927, and under the Mississippi practice was heard on oral testimony. Stone & Stone did not call Turley or Beall as witnesses in the case, or request their presence. Mr. Crabtree borrowed the undelivered trustee's deed to Koehler to introduce in evidence to prove his title. The result of the trial was that Koehler's bill was dismissed by the court. The defendant continued cutting timber until January 1, 1928, when his contract expired by limitation. Koehler then commenced to demand some satisfaction for the timber cut off the place from May 16, 1927, to January 1, 1928. Nothing came of the conferences held on this matter, and finally, on October 4, 1929, the Fidelity Mutual Life Ins. Co. filed its bill in the Chancery Court of Marshall County, Mississippi, seeking a foreclosure under the original mortgage. This suit is still pending at this time. Koehler filed a cross-bill in that suit, bringing in the parties to this suit and setting up the same matters herein set forth. A demurrer was filed to this cross-bill, based on the bringing in of new parties, and was sustained by the court and the cross-bill dismissed. Thereupon, Koehler filed the present bill. The Turley-Bullington Co. has filed its cross-bill herein seeking a judgment against Paul Koehler on his note for $3,500 to be credited by the sum realized on the foreclosure by the court in Mississippi.

Complainants say that they would not have traded for the Coffee plantation had they known the timber contract could not be terminated. They assert they had no knowledge of that priority of the mortgage over the timber contract had been waived. This contention is based on the wholly erroneous conception that any such waiver was made. It is perfectly plain that when the conditions

on which the mortgagee was willing to waive priority were never met there was no waiver. Beall executed a warranty. Koehler had his remedy on the warranty. Instead of suing on the warranty, complainants have undertaken to seek rescission for fraud. There was no fraud on the part of defendants. The suit at bar is one for rescission for fraud, and not for damages for breach of warranty against encumbrance. The two remedies are, of course, utterly different. The first is a repudiation of the contract, and the second is an affirmance. Mr. Crabtree testifies that rescission instead of abatement of purchase price to the extent of value of timber loss, was promptly elected in October, 1929. In the foreclosure suit at Holly Springs, it may be that Koehler would be allowed to set up any damage he may have sustained by reason of breach of warranty against the mortgage indebtedness. This, however, is a question for the Mississippi court and is not presented here. The question of abatement of purchase price is not presented in this suit.

With regard to complainants' contention that they would not have traded had they known the real amount of timber on the plantation, it is sufficient to say that complainants went into actual possession of the plantation in early April, 1927, and continued in possession during the balance of 1927, 1928, and 1929. Not until the present bill was filed was any complainant made about the quantity of the timber. One defrauded must act promptly on discovery of the fraud. After being in possession for several months, with every opportunity to inspect the timber, complainants filed their bill against Goodman and averred they were the owners of the plantation.

4. Paul Koehler, as a part of the consideration of the Coffee plantation, executed a promissory note for $3500 payable on demand, to the order of Henry H. Beall. This $3500 represents taxes paid by Turley-Bullington Co. to protect the Fidelity Mutual Life Ins. Co. in its mortgage, and interest paid by it to said insurance company on the mortgage indebtedness. The only defense offered is the matter set up in the original bill herein as entitling the Koehlers to a rescission of the transaction for fraud. Complainants having failed to establish fraud entitling them to the relief sought, it follows that judgment must go against them on the note. This note is secured by vendors lien on the Coffee plantation, subject to the Fidelity debt. The judgment on this may be stayed until it is ascertained what net amount, if any, be realized out of the foreclosure sale in Mississippi had under the decree of the Chancery Court of Holly Springs. It should again be said that the bill herein is for rescission and not damages for breach of warranty. No plea of recoupment or set-off is offered against the suit on the $3500 note, instead cancellation for fraud is sought.

5. My conclusion is, after a careful consideration of the voluminous record in the case, that complainants' bill must be dismissed at their cost and that cross-complainant, Turley-Bullington Co. and Fidelity Mutual Life Ins. Co. recover of cross-defendants, Paul Koehler, the sum of $3500, and $19,904.73 respectively, with interest therein, together with attorneys fees as provided in said note and the cost arising on the bill. ''(Signed) D. W. DeHaven, Chancellor.''

After the finding of the facts by the Chancellor as above set forth, the complainants requested additional findings numbering in all seventy-three. The Chancellor declined the request for additional finding of facts, stating that he had heretofore filed an elaborate finding of facts wherein all the material facts and circumstances of the case are considered and definite conclusions reached, and further recited that complainants' motion for additional findings embraces practically every fact heretofore passed on by the court, and many immaterial facts, and further stating that he did not consider that any material fact had been overlooked by the court in its finding of facts and in reaching his conclusions.

We have carefully compared the several assignments of error with the findings of fact and the conclusions reached by the Chancellor, and we are of the opinion that the assignments of error are not well taken, and that the learned Chancellor reached the correct conclusion on all the questions made the basis of assignment of errors. Reaching this conclusion it would serve no good purpose to further elaborate. It results that we find no error in the decree of the Chancellor and it is accordingly affirmed, and the cause is remanded to the Chancery Court of Shelby County for the carrying out of the decree.

Appellant and sureties on the appeal bond will pay the cost of this appeal.

Heiskell and Owen, JJ., concur.